## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                          Case No. 24-cr-263 (DSD/DJF)

           Plaintiff,

v.                                                                      **REPORT AND RECOMMENDATION**

Robert Joseph Anderson (3) and Aaron
Thomas Heifort (4),

           Defendants.

---

This matter is before the Court on Defendant Robert Joseph Anderson's Motion to Suppress Physical Evidence and Statement (ECF No. 86) and Defendant Aaron Thomas Heifort's Motion to Suppress Physical Evidence and Statements (ECF No. 116) (collectively, "Motions"). Defendants were indicted with conspiracy to distribute and possession with intent to distribute narcotics (ECF No. 1) arising from separate traffic stops involving narcotics detection canine ("K9") sniffs. Defendants challenge the legality of the K9 sniffs and subsequent searches of their vehicles on a variety of grounds. (ECF Nos. 153, 154.)

The Court held a hearing on Defendants' Motions on June 9, 2025. (*See* ECF No. 160.) During the hearing, the Court received into evidence nineteen exhibits from the government (Gov't Exs. 1-19)[1] and three exhibits from Mr. Heifort (Def. Exs. 1-3). (*See* ECF Nos. 140, 142.) The Court also heard testimony from five witnesses: West Central Minnesota Drug and Violent Crime Task Force Special Agent ("SA") Jake Maros; Wadena County Sheriff's Office Deputy Troy Wangsness; West Central Minnesota Drug and Violent Crime Task Force SA Kelby Jensen;

---

[1] For ease of reference, the government provided separately marked clips of longer exhibits that are recordings. (*See* ECF No. 142.) These clips are marked as sub-exhibits (e.g., 2A), and the Court references them when applicable.

Minnesota State Patrol Trooper Matthew Holden; and Dr. Mary Cablk, Ph.D. (*See* ECF No. 141.) Based on the parties' written submissions, the hearing testimony and exhibits, and on the entire file, the Court recommends the Motions be denied.

## BACKGROUND

### I.     The Investigation into the Death of Jeff Dailey

On November 10, 2023, police officers from the Wadena County Sheriff's Office arrived at a residence to investigate the death of a man named Jeff Dailey. (*See* ECF No. 160 at 11.) A toxicology report concluded that his death was caused by an overdose of methamphetamine and fentanyl. (*Id.*) The officers secured a warrant to search Mr. Dailey's cell phone and found text messages from November 9 and 10 between him and Defendant Bill Rude that discussed a drug sale. (*Id.* at 11-12.)

SA Maros interviewed Mr. Rude on December 6, 2023. (*Id.* at 13; Gov't Exs. 1-2.) Mr. Rude admitted to selling drugs to Mr. Dailey in the past. (Gov't Ex. 1 at 2.) Mr. Rude also stated that on November 8, 2023, he purchased drugs from Mr. Heifort (Gov't Ex. 1 at 2; Gov't Ex. 2A at 1:09-1:35), and that he had done so on several occasions (Gov't Ex. 2B at 00:06 -00:10). SA Maros asked Mr. Rude if he knew Mr. Heifort's supplier. (Gov't Ex. 2 at 30:48-30:52.) Mr. Rude identified a man from Wadena County named "Bob." (*Id.* at 30:52-31:26.) He later amended his account and said Bob was from the Twin Cities but mostly stayed in Wadena County because of a girlfriend in the area. (*Id.* at 38:18-38:33.) He further disclosed that Bob had recently been released from prison, gave directions to Bob's girlfriend's home, and identified Bob's girlfriend as Tiffany Shelton. (*Id.* at 38:30-40:00.)

A few days later, SA Maros drove by Ms. Shelton's home and saw a Ford truck parked in front. (ECF No. 160 at 18-19.) He ran the license plate of the vehicle and learned it was registered

to Mr. Anderson.  (*Id.*)  SA Maros reviewed Ms. Shelton's public Facebook account and saw that she had posted pictures of herself and Mr. Anderson, which confirmed their relationship.  (*Id.* at 19.)  SA Maros was familiar with Mr. Anderson because he had been arrested a few years earlier for drug trafficking offenses and was on probation at that time.  (*Id.*)

Based on this information, SA Maros developed a strong suspicion that Mr. Anderson had supplied the drugs that killed Mr. Dailey and focused his investigation on Mr. Anderson.  (*Id.*)  On December 15, 2023, Mr. Anderson had a meeting with probation.  (*Id.* at 20.)  While Mr. Anderson was in the meeting, Deputy Wangsness conducted a sniff of Mr. Anderson's vehicle with his K9, Nitro, and the dog indicated narcotics were inside.  (*Id.* at 20, 83-84.)  SA Maros then arranged another interview with Mr. Rude.  (*Id.* at 20.)  Mr. Rude told SA Maros he had witnessed a methamphetamine deal a few days earlier between Mr. Anderson and Mr. Heifort.  (*Id.*)  Based on Mr. Rude's statement and all the other evidence collected at that point, SA Maros applied for and received a warrant to place a location monitoring device on Mr. Anderson's vehicle.  (*Id.*)  The device showed Mr. Anderson making two trips from the Wadena area to the Twin Cities area on December 18 and 19, 2023.  (*Id.* at 21; Gov't Ex. 3 at 1.)  On the second of these trips, Mr. Anderson went to a café and grocery store in St. Paul, Minnesota called the La Palma Café.  (ECF No. 160 at 21; Gov't Ex. 3 at 1; *see also* ECF No. 160 at 66.)  He remained there for only a half hour before returning to Wadena County.  (Gov't Ex. 3 at 1; ECF No. 160 at 21.)  It takes approximately two and a half hours to drive there from Wadena County.  (ECF No. 160 at 48, 79.)  SA Maros testified that, in his training and experience, it is common for people in his area (presumably, West Central Minnesota) to "go down to the Twin Cities metro for very short periods of time and come back to pick up methamphetamine."  (*Id.* at 21.)

## II.    The Search of Mr. Anderson's Vehicle

On December 26, 2023, SA Maros used the location monitoring device to track Mr. Anderson on another trip to the La Palma Café. (Gov't Ex. 3 at 1; ECF No. 160 at 25.) This time, other police officers were at the destination by the time Mr. Anderson arrived and surveilled his activities. (ECF No. 160 at 25.) They advised SA Maros that, rather than using the public entrance, Mr. Anderson parked in the loading dock area of the café and entered using a side service door. (Gov't Ex. 3 at 1.) Approximately thirty minutes later, he exited the café via the same service door. (ECF No. 160 at 25; Gov't Ex. 3 at 1.) Notably, he was holding a cream-colored plastic grocery bag when he exited that he did not have when he entered. (ECF No. 160 at 25; Gov't Ex. 3 at 1.) He then got in his vehicle and started driving back towards Wadena County. (ECF No. 160 at 25; Gov't Ex. 3 at 1.) Once he crossed into Wadena County, SA Maros contacted Deputy Wangsness, provided background information about the investigation, and told him to initiate a traffic stop to conduct a K9 sniff of Mr. Anderson's vehicle. (ECF No. 160 at 26; Gov't Ex. 3 at 2; Gov't Ex. 8 at 1.) Deputy Wangsness remembered Mr. Anderson's name and that he had conducted a positive drug sniff on Mr. Anderson's vehicle only a few weeks earlier. (Gov't Ex. 8 at 1.)

Relying on SA Maros's tracking information, Deputy Wangsness located Mr. Anderson's vehicle and initiated a stop.[2]  (ECF No. 160 at 86; Gov't Ex. 8 at 1.) Deputy Wangsness approached the driver-side door and asked for Mr. Anderson's license. (ECF No. 160 at 87; Gov't Ex. 8 at 1-2; Gov't Ex. 9 at 00:23-00:46.) After confirming Mr. Anderson's identity, Deputy

---

[2] Deputy Wangsness testified that, before initiating the stop, he witnessed Mr. Anderson touch the fog line on the road. (ECF No. 160 at 87.) Because this detail was not in Deputy Wangsness' report or recorded in any other evidence in the record, the Court disregards it. But this detail is irrelevant for the purposes of Mr. Anderson's Motion since, as detailed below, reasonable suspicion of drug trafficking activity supported the stop and subsequent K9 sniff.

Wangsness asked Mr. Anderson to exit and conducted a K9 sniff of the vehicle. (ECF No. 160 at 88; Gov't Ex. 8 at 2; Gov't Ex. 9A.) K9 Nitro changed his breathing and behavior around the driver-side door. (Gov't Ex. 8 at 2; Gov't Ex. 9A at 1:02-1:07.) K9 Nitro then sat, which indicated narcotics were inside. (Gov't Ex. 8 at 2; ECF No. 160 at 93.) Deputy Wangsness informed SA Maros of K9 Nitro's positive indication, and SA Maros told him to search the vehicle without a warrant. (Gov't Ex. 8 at 2; Gov't Ex. 9 at 9:46-9:55; ECF No. 160 at 95-96, 114.) Deputy Wangsness and other officers on the scene searched the vehicle and found a variety of narcotics, including over 1.5 kilograms of methamphetamine in a cream-colored grocery bag inside a backpack. (Gov't Ex. 3 at 2; Gov't Ex. 8 at 2-3; Gov't Ex. 9 at 13:06-13:35; ECF No. 160 at 27.)

SA Maros arrived at the scene after Deputy Wangsness had already searched the vehicle and placed Mr. Anderson in handcuffs in the back of a squad car. (Gov't Ex. 3 at 2.) SA Maros gave Mr. Anderson a *Miranda* warning and Mr. Anderson agreed to speak to him without an attorney present. (*Id.*) Mr. Anderson then admitted to carrying 2-3 pounds of methamphetamine in the back of his car. (*Id.*) SA Maros further asked Mr. Anderson if he would be willing to speak with him at the Wadena County Sheriff's Office, and Mr. Anderson agreed. (*Id.*) At the Sheriff's Office, SA Maros again advised Mr. Anderson of his *Miranda* rights. (*Id.*; Gov't Ex. 4 at 1:27-1:29.) SA Maros asked Mr. Anderson to describe his activities that day, and Mr. Anderson confessed to buying drugs. (Gov't Ex. 3 at 2; Gov't Ex. 4A.) Mr. Anderson also gave SA Maros permission to search his phone. (Gov't Ex. 3 at 2; Gov't Ex. 4 at 03:41-03:46.) When asked about previous supply trips, Mr. Anderson said he had picked up drugs in the Twin Cities at the La Palma Café and then made a few stops, including a stop at Mr. Rude's house. (Gov't Ex. 4C at 00:00-1:08.) He admitted that he had been selling drugs to Mr. Rude since around the end of November 2023. (Gov't Ex. 4C at 3:06-3:30; Gov't Ex. 4F 00:11-00:23.)

Mr. Anderson further admitted that he had sold drugs to Mr. Heifort in the past. (Gov't Ex. 4F at 00:24-00:40.) Mr. Anderson also said Mr. Heifort would go down to the Twin Cities to purchase his own supply of narcotics and had done so a week earlier. (*Id.* at 00:40-00:56.) SA Maros later reviewed text messages on Mr. Anderson's phone between Mr. Anderson and Mr. Heifort. (ECF No. 160 at 35-36; Gov't Exs. 5-6.) He found repeated conversations about the sale of narcotics during the period from November 8, 2023 to December 26, 2023. (ECF No. 160 at 38; Gov't Ex. 5; Gov't Ex. 6 at 32-34, 39-40, 105-07, 115-21.)

**IV.    The Search of Mr. Heifort's Vehicle**

Law enforcement began investigating Mr. Heifort for drug trafficking as early as November 15, 2023, after they recovered a small of amount of methamphetamine from Mr. Heifort's vehicle. (ECF No. 160 at 122-23.) Though the amounts were small, the narcotics were in much larger Ziploc bags, which suggested he had previously possessed a much larger quantity. (*Id.* at 123.) Based on this evidence, SA Jenson secured a warrant to track the location of Mr. Heifort's cell phone. (*Id.* at 124.)

On the morning of December 31, 2023, SA Jenson relied on the live location data from Mr. Heifort's cell phone to track his movements.[3] (ECF No. 160 at 125; Gov't Ex. 10 at 2.) The data showed Mr. Heifort in St. Cloud for several hours, including at a location within 400 meters of 19½ Avenue N, which SA Jensen recognized because it was the location of a "previous interdiction stop." (Gov't Ex. 10 at 2.) SA Jensen observed that around 11:20 a.m., Mr. Heifort began traveling eastbound towards the Twin Cities. (ECF No. 160 at 127; Gov't Ex. 10 at 2.) At approximately 12:07 p.m., Mr. Heifort was in the Como Park neighborhood of St. Paul. (ECF No. 160 at 127; Gov't Ex. 10 at 2.) At around 12:52 p.m., Mr. Heifort was near the Rosedale Center Mall, where

---

[3] Mr. Heifort's phone transmitted location data every 15 minutes. (Gov't Ex. 10 at 2.)

he remained until 1:51 p.m., when he started driving westbound towards St. Cloud.  (ECF No. 160 at 127-28; Gov't Ex. 10 at 2.)   After a brief stop near the 19½ Avenue N address where he had been previously, Mr. Heifort began traveling north.  (ECF No. 160 at 128-29; Gov't Ex. 10 at 2.) SA Jensen testified that, in his experience, these movement patterns were consistent with drug trafficking activity.  (ECF No. 160 at 127-28.)   SA Jensen contacted Trooper Holden, told him about the drug investigation, including Mr. Anderson's involvement, and instructed him to conduct a traffic stop of Mr. Heifort's vehicle.  (ECF No. 160 at 130, 142; Gov't Ex. 10 at 2; Gov't Ex. 17 at 1.)

Trooper Holden intercepted Mr. Heifort's vehicle and immediately noticed that the tires on Mr. Heifort's vehicle extended past the fenders, which is an equipment violation.  (ECF No. 160 at 146; Gov't Ex. 17 at 2.)   Trooper Holden "activated [his] emergency lights and conducted a traffic stop for the equipment violation and ongoing drug investigation."  (Gov't Ex. 17 at 2; ECF No. 160 at 146.)  He approached the driver-side door and spoke with the driver, Mr. Heifort.  (ECF No. 160 at 146-47; Gov't Ex. 17 at 2.)  Trooper Holden noticed there were two passengers inside the vehicle and that it was equipped with a radar detector.  (ECF No. 160 at 147.)  He saw the rear passenger making furtive movements and asked the passenger to stop moving.  (ECF No. 160 at 148; Gov't Ex. 10 at 2; Gov't Ex. 18 at 1:59-2:07.)  Trooper Holden asked Mr. Heifort to exit his vehicle and stand near the police cruiser while he checked Mr. Heifort's identification.  (Gov't Ex. 10 at 2; Gov't Ex. 18 at 2:52-2:57.)  After conversing with Mr. Heifort for several minutes, Trooper Holden returned to Mr. Heifort's vehicle and asked the passengers to exit and provide identification.  (Gov't Ex. 10 at 2; Gov't Ex. 18 at 8:05-9:40.)   The rear passenger identified himself as Robert Anderson from Wadena.  (Gov't Ex. 18 at 9:22-9:33.)

Trooper Holden conducted a sniff of Mr. Heifort's vehicle with his K9, Breki. (Gov't Ex. 18A; Gov't Ex. 19 at 15:58-17:58.) K9 Breki went around the vehicle several times and paused around the rear passenger area on multiple occasions. (Gov't Ex. 18A at 1:00-1:07; 1:14-1:17; 1:32-1:36; 1:40-1:45.) Breki never gave a "final indication"[4] signaling the presence of narcotics, however. (ECF No. 160 at 171.) Trooper Holden terminated the sniff and informed other officers present that K9 Breki "keeps pulling low, like under the box … so that's an 'alert.'"[5] (Gov't Ex. 18A at 2:18-2:24.) Trooper Holden and the other officers searched Mr. Heifort's vehicle. (Gov't Ex. 18 at 17:54-31:13.) The officers found an assortment of items, including food, toys, and needles. (*Id.*) In addition, in the rear passenger area, Trooper Holden found a blue backpack containing marijuana and a grocery bag containing 869 grams of methamphetamine. (Gov't Ex. 18 at 20:10-21:41; Gov't Ex. 17 at 2.)

## DISCUSSION

### I.     The *Terry* Stops

Mr. Anderson argues the Court should suppress all evidence secured as a result of the search of his vehicle on December 26, 2023 because: (1.) Deputy Wangsness did not have a reasonable suspicion sufficient to justify stopping Mr. Anderson on that day (*see* ECF No. 153 at 6-9); and (2.) Deputy Wangsness unlawfully extended the stop to conduct a K9 sniff of the vehicle

---

[4] "An *indication* is a trained behavior, such as sitting or lying down," that indicates an odor that the dog was trained to detect and identify is present. (Def. Ex. 1 at 3.) "K9 Breki was trained to sit or lay down when he detected narcotics odor." (*Id.*)

[5] An "alert" is an untrained behavior in response to an odor of interest to the dog. (*See* Def. Ex. 1 at 4.) Alert behaviors include "closed mouthed sniffing, a sudden change in direction termed a 'head snap', [and] tail wagging, among others." (*Id.*) Alerts are not unique behaviors "tied specifically to a target odor," such as the odor of narcotics in Breki's case. (*Id.*) These behaviors can also arise when a dog smells "food, toys, humans, any novel odor, or other animals." (*Id.*) Trooper Holden testified that K9 Breki had a history of engaging in alert behaviors without performing an indication when K9 Breki correctly identified narcotics but could not identify their precise location. (ECF No. 160 at 169-70.)

(*see id.* at 10-15). Mr. Heifort argues the Court should suppress all evidence secured as a result of the search of his vehicle on December 31, 2023 because: (1.) Trooper Holden improperly extended the traffic stop for an equipment violation to conduct a K9 sniff; and (2.) Trooper Holden lacked reasonable suspicion to conduct the K9 sniff. (ECF No. 154 at 6.)

### A.    Legal Standards

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 9 (1968)). Such stops ("*Terry* stops") are lawful if, based on a totality of the circumstances: (1.) police have a "particularized and objective basis" for suspecting that legal wrongdoing is afoot that warrants further investigation (i.e., a reasonable suspicion); or (2.) there is a "fair probability" that legal wrongdoing has occurred or is occurring (i.e., probable cause). *Id.* Legal wrongdoing includes serious offenses such as drug trafficking, *see e.g.*, *United States v. Magallon*, 984 F.3d 1263, 1277 (8th Cir. 2021), as well as the most minor traffic violations, *see United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001).

The police must be "reasonably diligent" in investigating the matter that provided grounds for the stop and not cause a "measurable delay." *Magallon*, 984 F.3d at 1278. But they are not restricted to a single purpose or mission when they stop a vehicle. If an officer has a reasonable suspicion of both a major criminal offense and a traffic violation, the resolution of his investigation into one does not mean he must terminate the stop. *See United States v. Rederick*, 65 F.4th 961, 966-67. Rather, the stop may continue so long as the officer is reasonably diligent in investigating *all* the legal violations that he reasonably suspects are afoot. *See id.* (affirming denial of motion to suppress evidence obtained as a result of a vehicle stop that was premised on both a traffic

violation and suspicion of drug trafficking); *United States v. Violante-Lujano*, No. 23-cv-315(2) (SRN/DTS), 2024 WL 4524503, at *4 (D. Minn. Oct. 18, 2024) (holding that officer was permitted to extend traffic stop in order to investigate both traffic violation and drug-related violation). The officer only needs to end the stop when all "reasonable suspicion or probable cause dissipates." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993).

## B.   Analysis

### 1.   Mr. Anderson

Based on a totality of the circumstances, reasonable suspicion supported the initial *Terry* stop involving Mr. Anderson on December 26, 2023. Law enforcement had amassed a significant amount of evidence that Mr. Anderson was actively engaged in drug trafficking and suggesting he was transporting drugs at the time of the stop. Mr. Rude told police that Mr. Anderson trafficked drugs from the Twin Cities to Wadena County. (Gov't Ex. 2 at 30:52-31:26.) On December 15, 2023, a K9 sniff indicated that Mr. Anderson's parked truck contained drugs. (ECF No. 160 at 20, 83-84.) GPS monitoring showed Mr. Anderson making several three-hour drives to the Twin Cities, stopping for only thirty minutes, and then immediately taking the long journey back to Wadena County. (ECF No. 160 at 21, 25, 48, 79; Gov't Ex. 3 at 1.) Not only did this activity align with Mr. Rude's reporting, but SA Maros testified that, based on his training and experience, this travel pattern is consistent with drug trafficking activity generally. (ECF No. 160 at 21.)

With these facts in mind, SA Maros observed Mr. Anderson on December 26 acting in a suspicious manner that suggested he had contraband in his car when he was stopped. On that day, Mr. Anderson made another three-hour journey to the Twin Cities and went to the La Palma Café, which he had visited the previous week. (Gov't Ex. 3 at 1; ECF No. 160 at 25.) When he arrived, he avoided the public entrance and instead parked near the loading dock and entered via a service

door.  (Gov't Ex. 3 at 1.)  Shortly thereafter, he exited via the same door with a plastic grocery bag in hand.  (ECF No. 160 at 25; Gov't Ex. 3 at 1.)  Although entering and exiting a grocery store with a grocery bag is typically innocuous behavior, driving two-and-a-half hours to visit a grocery store for a few minutes, parking in the loading area, and carrying the bag out of a service door is suspicious.  These facts, taken together with the other facts implicating Mr. Anderson in drug trafficking, created reasonable suspicion that Mr. Anderson's grocery bag contained contraband.

Mr. Anderson argues the stop was unlawful because: (1.) Deputy Wangsness initiated the stop based on SA Maros's order; (2.) SA Maros had no proof Mr. Anderson was carrying drugs in the grocery bag when he left the café; and (3.) SA Maros did not obtain a warrant to search the vehicle when he otherwise could have obtained one.  (*See* ECF No. 153 at 8-9.)  To the extent Mr. Anderson challenges the fact that Deputy Wangsness acted on another officer's order, his argument is meritless.  It is black letter law that a "patrol officer need not know the specific facts that caused the stop" and that he can "rely upon an order that is founded on reasonable suspicion" without running afoul of the Fourth Amendment.  *United States v. Jacobsen*, 391 F.3d 904, 907 (8th Cir. 2004).  SA Maros's knowledge was imputed to Deputy Wangsness when he ordered Deputy Wangsness to stop Mr. Anderson.  Mr. Anderson's claim that the stop was unlawful because SA Maros lacked "proof" he was carrying drugs similarly lacks merit.  Probable cause is not required to carry out a lawful *Terry* stop—much less "proof"—and as previously explained, SA Maros had gathered enough evidence to establish reasonable suspicion for an investigatory stop.  Finally, the suggestion that SA Maros was obligated to obtain a warrant to search the vehicle because he "otherwise could have gotten one" has no basis in the law.  A warrant was unnecessary because law enforcement had sufficient reasonable suspicion for the initial *Terry* stop, and Deputy Wangsness did not search the vehicle until probable cause was established when K9 Nitro provided

a positive indication that drugs were inside. (*See* ECF No. 153 at 11, citing *California v. Acevedo*, 500 U.S. 565, 579-80 (1991), for the proposition that "[u]nder the automobile exception, the police may search a vehicle without a warrant if they have probable cause to believe that contraband or evidence of a crime will be found inside"); *see also United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) ("[A]n alert or indication by a properly trained and reliable drug dog provides probable cause … for the search of a vehicle."); (Gov't Ex. 7, Deputy Wangsness and K9 Nitro's certificate of good standing in the National Police Canine Association).

Mr. Anderson further argues the K9 sniff unreasonably extended the length of the stop because any suspicion that Mr. Anderson was driving while impaired was dispelled well before the K9 sniff occurred. (*See* ECF No. 153 at 11-12, 14-15.) Mr. Anderson's argument is unavailing. As Mr. Anderson acknowledges, Deputy Wangsness stopped him based on SA Maros's belief that Mr. Anderson had drugs in his possession and not based on any evidence of impaired driving. (*See id.* at 14.) Thus, whether or not Deputy Wangsness dispelled a suspicion of impaired driving is not a proper measure for evaluating the duration of the stop. *See Jacobsen*, 391 F.3d at 906-07 (rejecting assertion that reasonable suspicion ought to be based on officer's false statement about a faulty taillight, instead of well-founded suspicion of drug trafficking activity). Instead, the Court must evaluate whether the K9 sniff occurred before a reasonable suspicion that Mr. Anderson was carrying drugs was dispelled. "Addressing the suspicion of drug activity requires time." *Rederick*, 65 F.4th at 967. Here, Deputy Wangsness *completed* the K9 sniff of Mr. Anderson's car approximately five minutes after initiating the stop. (Gov't Ex. 9 at 00:00-4:09.) The Eighth Circuit has found much longer investigatory stops to be reasonable. *See Magallon*, 984 F.3d at 1278 (over an hour-long stop); *Rederick*, 65 F.4th at 967 (twenty-seven minute stop); *United States v. Murillo-Salgado*, 854 F.3d 407, 416 (8th Cir. 2017) (twenty-three minute stop). The Court has

also reviewed the camera footage from the stop and sees no evidence of any improper delay tactics being used. (*See* Gov't Ex. 9 at 00:00-4:09.) The Court thus concludes that the K9 sniff did not unreasonably prolong the stop.

For the foregoing reasons, the investigatory stop of Mr. Anderson's vehicle was properly supported by reasonable suspicion and the K9 sniff did not improperly extend its duration. The Court recommends that Mr. Anderson's Motion to Suppress Physical Evidence and Statement (ECF No. 86) be denied accordingly.

### 2.    Mr. Heifort

Mr. Heifort similarly contends the police unlawfully prolonged the *Terry* stop of his vehicle because they detained him longer than necessary to ticket him for having his tires extend past the fenders. (ECF No. 154 at 6-7.) But when Trooper Holden stopped Mr. Heifort's vehicle, he not only observed the equipment violation, but also had a reasonable suspicion Mr. Heifort was carrying drugs in the vehicle. The police had gathered substantial evidence implicating Mr. Heifort in drug trafficking activity at that point. Mr. Rude told police that Mr. Heifort was an active drug dealer (Gov't Ex. 1 at 2; Gov't Ex. 2.A at 1:09-1:35; Gov't Ex. 2.B. at 00:06-00:10), and that he had recently witnessed Mr. Heifort completing a drug transaction with Mr. Anderson (ECF No. 160 at 20). Mr. Anderson confirmed he had sold drugs to Mr. Heifort (Gov't Ex. 4F at 00:24-00:40) and said Mr. Heifort would go down to the Twin Cities sometimes to purchase drugs (*id.* at 00:40-00:56). Text messages on Mr. Anderson's phone confirmed Mr. Anderson's account. (ECF No. 160 at 38; Gov't Ex. 5; Gov't Ex. 6 at 32-34, 39-40, 105-07, 115-21.) Additionally, police had recently found drugs in Mr. Heifort's possession under circumstances suggesting he had previously possessed a much larger quantity of them. (ECF No. 160 at 123.)

With these facts in mind, police observed the cell tracking data from Mr. Heifort's phone showing he was returning from a trip to the Twin Cities with a few relatively short stops before making the long trip home. (Gov't Ex. 10 at 2.) SA Jensen testified this type of movement is consistent with drug trafficking behavior. (ECF No. 160 at 127-28.) Given Mr. Anderson's account of Mr. Heifort's recent trip to the Twin Cities to purchase narcotics, it was reasonable for the police to suspect a similar purpose at the time of the traffic stop. These facts were adequate to create a reasonable suspicion that Mr. Heifort had drugs or other evidence of drug trafficking activity in his vehicle after he left the Twin Cities. And since Trooper Holden stopped Mr. Heifort based on an order from other officers who were familiar with the details of the investigation into Mr. Heifort's drug trafficking activities and movements that day, their knowledge was imputed to him. *See Jacobsen*, 391 F.3d at 907.

One of Mr. Heifort's stops during the trip, as shown by the cell tracking data, was near an address in St. Cloud that was known to police from a previous drug interdiction. (Gov't Ex. 10 at 2.) But the tracking data was only capable of pinpointing Mr. Heifort's location within a 402-meter certainty. (*Id.*) Mr. Heifort disputes whether reasonable suspicion supported the traffic stop on the ground that the cell tracking technology police used was too imprecise. (*See* ECF No. 154 at 10-11.) He argues his proximity to the St. Cloud address associated with drug activity was too attenuated to establish reasonable suspicion. (*Id.*) The problem with Mr. Heifort's argument is that it overlooks all the other evidence the police had gathered. Whether the officers reasonably believed he went to the suspect address in St. Cloud is not dispositive because even without that information, the totality of the circumstances established reasonable suspicion. And because the officers had reasonable grounds to suspect not only the equipment violation but also that Mr.

Heifort was transporting drugs, Trooper Holden did not unlawfully prolong the stop when he conducted the K9 sniff.

## II.    Probable Cause

Mr. Heifort also argues the Court should suppress all evidence secured as a result of the search of his vehicle on December 31, 2023 because neither K9 Breki's alert to the presence of drugs nor the totality of the circumstances established probable cause.  (ECF No. 154 at 12-17; ECF No. 159.)  He challenges both Breki's reliability and the fact that Breki did not give a trained indication signaling the presence of narcotics.

### A.    Legal Standards

 "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause … for the search of a vehicle."  *Winters*, 600 F.3d at 967.  "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  *Florida v. Harris*, 568 U.S. 237, 246-47 (2013).  Moreover, "absent contradictory circumstances, a trained dog's alert will establish probable cause when the dog's previous in-field accuracy rate exceeds 50 percent."  *United States v. Collier*, 116 F.4th 756, 761 (8th Cir. 2024).  But "[e]ven if a drug dog's performance record raises questions about his reliability, the issue is whether the totality of the circumstances present at the scene provided probable cause to search."  *Rederick*, 65 F.4th at 967 (citation modified).  "Contrary evidence that may detract from the reliability of the dog's performance properly goes to the credibility of the dog."  *Winters*, 600 F.3d at 967.

### B.    Analysis

Upon reviewing the testimony and exhibits in the record, the Court concludes K9 Breki's "alert" was adequate to establish probable cause for the search.  K9 Breki was and still is certified

by the North American Police Work Dog Association ("NAPWDA") for the detection of cocaine, heroin, and methamphetamine. (*See* Gov't Exs. 11-13.) Therefore, the court may presume that his alert provides probable cause, unless conflicting evidence is presented. *See Harris*, at 246-47.

Mr. Heifort's argument that K9 Breki is an unreliable narcotics dog relies substantially on the testimony and report of defense expert Mary Cablk. Mr. Heifort points to K9 Breki's purported in-field accuracy rate of just 47%. (*See* ECF No. 154 at 14.) Mr. Heifort argues this rate suggests that a coin-flip would be a more reliable indicator of the presence of narcotics, such that an indication from K9 Breki cannot establish probable cause. (*Id.*) But Mr. Heifort plainly misinterprets the data. The purported accuracy rate comes from Dr. Cablk's report, wherein she states:

> The summary report [of K9 Breki's deployment records] shows the canine was deployed 209 times for vehicle sniffs, "indicated" 98 times, and of those 89 were deemed "substantiated". Note, "substantiated" does not mean "drugs recovered", as officers will report other reasons for canine alerts when narcotics are not produced to bolster canine statistics. Based on the summary numbers provided, K9 Breki indicates approximately 47% *of the time when he is deployed*, including demonstrations, articles (not narcotics), and when the "K9 Not Used".

(Def. Ex. 1 at 6, emphasis added.)

The 47% statistic cited in Dr. Cablk's report represents the number of times K9 Breki indicated *when deployed* (i.e., 98 times out of 209 deployments); not the number of times K9 Breki either failed to indicate when narcotics were present or indicated when they were not. There is nothing in the report or anywhere else in the record to suggest narcotics were present during each of the 209 deployments. It is entirely possible that K9 Breki did not indicate during the remaining 111 deployments because no narcotics were there. Thus, it is misleading to state that this 47% number represents K9 Breki's rate of accuracy. To the contrary, Dr. Cablk's statistics suggest K9

Breki has an accuracy rate of almost 91%[6].  K9 Breki's 47% rate of indication on deployments simply does not provide a reasonable measure of his reliability.

Dr. Cablk's report seeks to cast doubt on K9 Breki's reliability on the ground that individual deployment records underlying the summary report show he indicated on "operational sniffs" only 11 of the 98 times and gave "some" false indications to non-target odors during his 11 "operational sniffs."  (*Id.*)  From this information she concludes, "Unlike in training, K9 'Breki' rarely indicates by sitting or laying down on deployment.  There is a significant difference in K9 'Breki's' reliability to indicate in training compared with on deployment."  (*Id.*)  This assessment is unpersuasive for a variety of reasons.  Dr. Cablk fails to define what constitutes an "operational sniff" or point to the specific deployment records supporting her conclusions.[7]  She points to no data illustrating the comparison between K9 Breki's training records and his deployment records. She also fails to specify how many times K9 Breki gave a false indication.  The Court is unable to divine whether K9 Breki made two or ten false indications.  The former would align with a high rate of reliability, while the latter would not.  The Court is also mindful of the inherent problems with in-field accuracy statistics.  As the Supreme Court observed in *Florida v. Harris*:

> Errors may abound in [in-field] records.  If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search.  Field data thus may not capture a dog's false negatives. Conversely … if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all.  The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person.  Field data thus may markedly overstate a dog's real false

---

[6] Dr. Cablk states that 89 of K9 Breki's 98 indications were substantiated, thus yielding an accuracy rate of 90.8%.  Dr. Cablk raises doubts about how police departments define the term "substantiated," but her report speaks in generalizations and does not point to any evidence that raises doubts about the accuracy of the K9 Breki's deployment records in particular.

[7] Though the government produced K9 Breki's training records for the Court's review (Gov't Ex. 16), neither party produced the deployment records on which Dr. Cablk's conclusions are based.

positives.  By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings.  There, the designers of an assessment know where drugs are hidden and where they are not— and so where a dog should alert and where he should not.  The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

568 U.S. at 245-46.  Given the records and certifications showing K9 Breki's reliability, Dr. Calbk's imprecise assessment of K9 Breki's in-field accuracy serves little value.

Mr. Heifort also challenges probable cause on the ground that K9 Breki only gave an "alert" and not an "indication".  (ECF 159 at 2.)  He relies principally on Dr. Cablk's testimony and report, which states that alerts can indicate the presence of a wide variety of odors; not just target odors such as narcotics.  (*See* ECF No. 154 at 13.)  But it is well-established that a drug detection dog's alert can establish probable cause in the absence of a trained "indication."  *See United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014); *Winters*, 600 F.3d at 967; *Collier*, 116 F.4th 756, 761-62 ("The reliability of a dog's alert, not its manner, is what matters.").

The Eighth Circuit recently confirmed that when a K9 officer can credibly identify alert behavior by his certified K9, an "indication" is not required to establish probable cause.  *See United States v. Thin Elk*, No. 24-2855, 2025 WL 2250556, *3-4 (8th Cir. Aug. 7, 2025).[8]  Here, Trooper Holden had: (1.) worked as a K9 officer for over two and a half years; (2.) completed a 240-hour training course with K9 Breki; (3.) completed multiple certifications with K9 Breki; (4.) trained with K9 Breki every month for a minimum of sixteen hours; and (4.) worked with K9 Breki since March 2022.  (ECF No. 160 at 152-62.)  These facts support Trooper Holden's claim that he is

---

[8] In *Thin Elk*, the dog was squarely focused on the vehicle being searched and alerted within seven seconds, *see Thin Elk*, 2025 WL 2250556, at *1, whereas K9 Breki appeared distracted and took longer to alert (Gov't Ex. 18A at 00:33-00:42).  However, the Court does not find these differences to be material since K9 Breki eventually alerted, and unlike the dog at issue in *Thin Elk*, he did so multiple times (*id.* at 1:00-1:07; 1:14-1:17; 1:32-1:36; 1:40-1:45; ECF No. 160 at 171).

capable of recognizing K9 Breki's significant alert behavior. (*See* ECF No. 160 at 164, 167-68; *see also id.* at 170, stating they were many instances during his time with K9 Breki in which Breki accurately alerted to the presence of narcotic odor but did not pinpoint the exact location with an indication); *see Rederick*, 65 F.4th at 968 (affirming district court's finding of reliability of K9 based on 24-hour training course, completion of 16 or more training hours on a monthly basis, and successful recertification).

Dr. Cablk's report states that Trooper Holden is unable to consistently read K9 Breki's alert behavior because "deployment records show 'no alert' when drugs were present, false alerts to marijuana, and misinterpreted 'alerts' to marijuana." (Def. Ex. 1 at 6.) But this analysis is supported by deployment records not in evidence and lacks sufficient specificity to provide the Court with useful insight. It is unclear whether these were limited instances or regular occurrences, or in what context the false alerts occurred. In the absence of such support, the Court finds the training records and certifications, Trooper Holden's testimony, and the other evidence in the record weighs in favor of finding that Trooper Holden credibly identified K9 Breki's alert behavior during the stop at issue, which provided probable cause for the search. *Cf. United States v. Davis*, No. 20-CR-209 (SRN/LIB), 2022 WL 1410717, at *10-13 (D. Minn. Apr. 15, 2022) (concluding K9 was unreliable based on: (1.) lack of any active certification; (2.) absence of training records showing reliability; (3.) testimony by K9's own handler that K9 had strong tendency to seek out food during sniffs and vehicle at issue had strong odor of food; and (4.) evidence showing K9 regularly failed to comply with orders to perform sniff).

Moreover, other circumstances further supported the existence of probable cause. As previously stated, Mr. Anderson was heavily implicated in drug trafficking activity and confessed to selling drugs to Mr. Heifort. (Gov't Ex. 4F at 00:24-00:40.) His presence in Mr. Heifort's

vehicle supported the suspicion that Mr. Heifort made his trip to the Twin Cities for the purpose of purchasing drugs.  Trooper Holden also observed Mr. Anderson making furtive movements in the back of the vehicle and ordered him to stop.  (ECF No. 160 at 148; Gov't Ex. 10 at 2; Gov't Ex. 18 at 1:59-2:07); *see also Winters*, 600 F.3d at 968 (concluding vehicle occupants' furtive movements supported probable cause determination).  Given the totality of the circumstances, including these facts and K9 Breki's alert, the Court concludes that the officers had probable cause to search Mr. Heifort's vehicle on December 31, 2023.

For the foregoing reasons, the Court concludes that Trooper Holden had a reasonable suspicion justifying both the stop and the K9 sniff, and that probable cause to search the vehicle was established before the search took place.  The Court accordingly recommends Mr. Heifort's Motion to Suppress Physical Evidence and Statements (ECF No. 116) be denied.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Robert Joseph Anderson's Motion to Suppress Physical Evidence and Statement (ECF No. 86) and Defendant Aaron Thomas Heifort's Motion to Suppress Physical Evidence and Statements (ECF No. 116) be **DENIED**.

Dated: August 28, 2025                        *s/ Dulce J. Foster*
                                              Dulce J. Foster
                                              United States Magistrate Judge

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.


Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).